**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re:

CCH JOHN EAGAN I PARTNERS, LLC              Case No. 25-24569-MAM
                                            (Jointly Administered)


CCH JOHN EAGAN II PARTNERS, LLC             Case No: 25-24571-MAM


                                            Chapter 11
_____Debtors._____/

**OBJECTION TO ADEQUACY OF THE DEBTORS' PROPOSED DISCLOSURE**
**STATEMENT RELATED TO THEIR CHAPTER 11 PLAN**

The Housing Authority of the City of Atlanta, Georgia ("Atlanta Housing") respectfully

submits this objection (the "Objection") to the adequacy of the information in the above-captioned

debtors' (the "Debtors") proposed *Disclosure Statement in Support of Joint Chapter 11 Plan of*

*Reorganization* [Docket No. 87] (the "Disclosure Statement") related to the Debtors' *Joint Chapter*

*11 Plan of Reorganization* [Docket No. 88] (the "Plan") and hereby states as follows:

**Preliminary Statement**

1.      For all the reasons set forth below, the Disclosure Statement does not contain

adequate information for creditors to evaluate and vote on the Plan.  In particular, the Disclosure

Statement and Plan assume the success of a highly speculative resyndication process. There is no

reasonable prospect that the Debtors will be successful in this process, nor is there any guarantee

that even if the resyndication process progresses as Debtors' hope for that it will generate sufficient

proceeds to pay all creditors in full as the Plan assumes will happen.  Additionally, the Debtors do

not provide any alternatives if either the resyndication process is unsuccessful or does not generate

sufficient returns to pay creditors.

2.      It also appears the Debtors wish to confirm their Plan before October 2026 (and deem it substantially consummated soon thereafter in contravention of applicable bankruptcy law) which would be before the first material milestone in the resyndication process is even achieved. Further, even if that step is timely achieved, it is contemplated that the resyndication would not close until later in 2027.  Disclosure Statement, IV(H)(1)(C).

3.      The Plan itself also seems rushed to meet the 90-day timeline applicable to single-asset real estate cases and is inconsistent and incomplete.  For instance, it is unclear whether the Debtors primarily seek to reorganize via the Plan (albeit apparently with equity revesting in the equity holders but with no new value paid in money or money's worth) or whether the Plan seeks to consummate a private sale to affiliated new companies ("NewCos") (again for no payment at the time of transfer).  Atlanta Housing believes the Plan is unconfirmable and will present its full confirmation objections to the Debtors' Plan after discovery and depositions have been taken and prior to the confirmation objection deadline, but the clear lack of feasibility of the Plan even at this stage necessitates denial of the Disclosure Statement.  Creditors should not be forced to spend time and money objecting to and ultimately voting on a patently unconfirmable plan.

4.      In February 2026, Atlanta Housing proposed that the Debtors retain a brokerage firm with experience marketing affordable housing projects for sale and ultimately pursue a Section 363 sale in tandem with the Debtors' preferred resyndication process and proposed specific qualified brokerage firms for discussions.  As of the time of filing, the Debtors still have not substantively responded nearly 4 months later despite follow up from Atlanta Housing.  Atlanta Housing continues to believe a Section 363 sale process would result in creditor recoveries much more quickly than the Debtors' Plan and would provide a market test (which, in its current form,

the Debtors' Plan lacks). Atlanta Housing is prepared to file a creditors' plan providing for such a sale process.

## Background

5. On December 10, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered.

6. On March 9, 2026, the Debtors filed their Disclosure Statement and Plan.

## Argument

### I.    The Disclosure Statement Should Not Be Approved

#### a.   Legal Standard

7. "The purpose of the disclosure requirements in §§ 1123 and 1125 is to allow creditors to cast an informed vote for or against a plan of reorganization." *In re M. Davis Mgmt., Inc.*, No. 6:09-BK-02071-KSJ, 2011 WL 3585821, at \*10 (Bankr. M.D. Fla. July 19, 2011). To that end, a debtor must provide adequate information in the disclosure statement. *In re Coastal Realty Invs., Inc.*, No. 12-20564, 2013 WL 214235, at \*5 (Bankr. S.D. Ga. 2013).

8. The Bankruptcy Code defines 'adequate information' as:

> information of a kind, and in sufficient detail . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information

11 U.S.C. § 1125(a)(1). The adequacy of information contained within a disclosure statement is determined on a case-by-case basis, "with a view to deciding whether the information in the Disclosure Statement provides creditors with an accurate basis to determine their position on the plan." *In re Ocala Inn Mgmt., Inc.*, Case No. 3:12-bk-2468-

PMG, 2013 WL 12461131 at *2 (Bankr. M.D. Fla. May 15, 2013). "'Beyond the statutory guidelines described in § 1125(a)(1), the decision to approve or reject a disclosure statement is within the discretion of the bankruptcy court.'" *In re Howell*, No. 09-91538, 2011 WL 1332176, at *1 (Bankr. N.D. Ga. Jan. 21, 2011) (citations omitted).

9. Relevant factors for evaluating the adequacy of a disclosure statement may include:

(1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectibility of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Metrocraft Pub. Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).

10. It is true that a debtor need not be able to predict the future with certainty, but conclusory allegations or opinions of the debtor provided without supporting facts are generally not acceptable. *In re Coastal Realty Invs.*, 2013 WL 214235, at *6 (citations omitted). "When providing creditors with information in connection with a disclosure statement, more is better. A disclosure statement should provide the average unsecured creditor 'what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.'" *In re Radco Props., Inc.*, 402 B.R. 666, 683 (Bankr. E.D.N.C. 2009) (quoting *In re Joseph A. Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

b. **The Disclosure Statement is Plainly Inadequate**

11.     The Debtors' Disclosure Statement is inadequate for myriad reasons.  For one, the Disclosure Statement does not analyze the tax consequences of the Plan to the Debtors, stating only that "[t]he Plan Proponent does not anticipate that there are any significant federal tax consequences . . ."  Disclosure Statement, VI(A).  Section 1125(a)(1) specifically states that adequate information includes "a discussion of the potential material Federal tax consequences of the plan to the debtor . . .".  11 U.S.C. § 1125(a)(1).  Failing to provide such information, which is specifically required by the Bankruptcy Code, means that creditors cannot assess the tax consequences of the Plan and the Disclosure Statement is, accordingly, inadequate.  *See In re Zaruba*, 384 B.R. 254, 256 (Bankr. D. Alaska 2008) (writing that disclosure statement "does not constitute an adequate discussion of the tax effects of the plan" where it said only that the debtors had been advised there would be no adverse tax consequences).

12.     The Disclosure Statement also does not include projections, including for the extended period between plan confirmation and the supposed resyndication sale closing in late 2027.  Failing to provide such projections in a disclosure statement has been cited as a basis to find the applicable disclosure statement inadequate.  *See In re Howell*, 2011 WL 1332176 at *2 ("the disclosure statement . . . should have contained projections over a reasonable period of time in the future (at least two years after a projected confirmation) showing how much revenue Debtor should receive each month from all sources (not just her real properties) and what expenses Debtor will incur in each such month (including personal expenses). Expenses should be itemized.").  Without this information, Atlanta Housing and other creditors (such as the unsecured creditors who are supposedly going to be paid from unquantified and highly speculative excess cash flow) are left to guess at the ultimate feasibility of the Plan, particularly whether the Debtors are likely to be able

5

to make payments and fund needed capital expenditures at the property prior to the closing of the resyndication financing.

13.     Another disqualifying omission is a the lack of a serious and realistic discussion of the Debtors' ongoing obligations and requirements to actually complete a challenging resyndication process.  To complete this process, the Debtors will be required to comply with the certain Ground Lease, the Building Code, and other applicable contractual or statutory obligations.  Indeed, projects which attempt to qualify for low-income housing tax credits are subject to stringent program and project requirements (among other things).  *See generally* 24 C.F.R. Part 92.  The Debtors provide a very cursory description of the resyndication process in the Disclosure Statement and aver that bonds "are expected to [be] obtained" and that such bonds require a valid volume cap allocation, compliance with federal tax requirements, and "issuer, borrower, trustee, credit enhancement/underwriting, disclosure, and closing conditions typical of the municipal bond market."  Disclosure Statement, IV(H)(1)(B).  This is a plainly inadequate description of the bond allocation process and standards for approval.  The Debtors will be subject to stringent federal and state laws which the Debtors gloss over in the Disclosure Statement.

14.     Likewise, the Debtors fail to discuss their own failure to operate the property as required by the Ground Lease, the Building Code and other laws as evidenced by the numerous pre-petition adjudicated building code violations and a long-list of capital expenditures required under the Final Check List agreed to with Atlanta Housing as set forth in more detail in Atlanta Housing's prior pleadings.  This is particularly important for creditors who are not fully aware of those violations and who may also not be familiar with the resyndication process or the municipal bond market.  This is yet another example of the inadequacy of the Disclosure Statement.

15.     Relatedly, a disclosure statement should contain all material information relating to the risks posed to creditors under the proposed plan. *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981); *see also In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).  The Debtors' Plan proposes to pay Priority Tax Claims, Class 1 Claims, Class 2 Claims, and Class 3 Claims in full.  However, such repayments are largely subject to the success of the resyndication process or are otherwise expected to be paid in monthly installments over extended periods of time out of  speculative monthly operating income.  If the resyndication process fails, it is unlikely the Debtors would be able to pay these classes in full or make monthly installment payments over a period of years.  Further, if the Ground Lease cannot be assumed due to numerous defaults which have not been cured or is deemed to be rejected, then the Debtors Plan also is not feasible.  That the success of the resyndication process and assumption of the Ground Lease are assumed are another inadequacies of the Disclosure Statement.

16.     The Debtors also included in the Disclosure Statement a contention that "the Court must determine the dollar amount that would be generated from the liquidation of the Debtor[s] assets and properties in the context of a Chapter 7 liquidation." Disclosure Statement, VI(B).  This is plainly not what is required by Section 1125(a), however, and it is imperative that the Debtors include such an analysis in reasonable detail in their Disclosure Statement. *In re Metrocraft Pub. Services*, 39 B.R. at 568.  It is incumbent on the Debtors to demonstrate that their Plan is better for creditors than a liquidation; it is not the job of the Court or creditors to value the Debtors' properties in a chapter 7 context (nor is it reasonable to expect as much where all pertinent documents lie with the Debtors and not the Court or creditors).  Failing to include any liquidation analysis clearly demonstrates that the Disclosure Statement is inadequate as a matter of law.

7

17.	There are other notable omissions, all of which bear on the adequacy of the Disclosure Statement.  Among other things, the Disclosure Statement: (i) does not discuss the prior bankruptcy and reorganization of John Eagan II; (ii) does not identify post-effective date management of the bankruptcy estates or the capitalization or ownership of the NewCos; (iii) does not contain a valuation of the Debtors' property or the reorganized equity; (iv) does not discuss any alternatives available to the Debtors to bring value to their estates (such as a sale process); and (v) does not address interim access to the $1.2 million in escrow or interim capital expenditures on the project before the resyndication process may conclude.  As stated, whether a disclosure statement contains information about a debtor's future management bears on its adequacy, as does whether it contains financial information, data, valuations or projections, information about the events leading to the chapter 11 filing, and information relevant to the risks posed to creditors under the Plan.  *In re Metrocraft Pub. Services*, 39 B.R. at 568.  That the Disclosure Statement is silent on all of these material considerations is another reason the Disclosure Statement does not contain adequate information for creditors.

18.	The Disclosure Statement also has other errors such as an incomplete footnote 2 which ends mid-sentence.

**II.	<u>The Plan is Patently Unconfirmable and the Court Should Not Allow the Debtors to Expend Time, Effort, and Resources Soliciting Such a Plan</u>**

19.	In ruling on a disclosure statement, if the applicable disclosure statement relates to a plan that is facially invalid, the court has an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of that plan.  *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989).  The Plan proposed by the Debtors is so flawed that proceeding to a vote on the Plan would be a waste of this Court's time and would force creditors, including Atlanta Housing, to incur unnecessary expense opposing it.

20.     For one, "[a] secured creditor's claim must be paid before any administrative claim is paid." *In re Cons. Cotton Gin. Co., Inc.*, 347 B.R. 572, 579 (Bankr. N.D. Tex. 2006).  However, the Debtors propose to pay allowed Administrative Claims in full "upon the date on which such Claims become due" but will only pay secured creditors upon the satisfaction of certain conditions (such as the hoped for completion of the LIHTC Transaction).  Disclosure Statement, IV(B)(1), IV(C).  This plainly contemplates paying administrative expenses as they come due before secured creditors' claims while those secured creditors are forced to wait for the LIHTC Transaction to be completed (if ever).[1]

21.     Additionally, a plan must be either consensual or found not to discriminate unfairly and be fair and equitable with respect to each dissenting class of creditors.  11 U.S.C. § 1129(a), (b).  This "cram down" provision includes an "absolute priority rule" as a component of the fair and equitable requirement which provides that no junior class retains any property or receives a distribution if senior claims are not fully paid. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii).  Put differently, a proposed "plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan 'on account of' such claims or interests. *In re Armstrong World Indus.*, 432 F.3d 507, 512 (3d Cir. 2005).  A plan violates the absolute priority rule where it allows a debtor to retain equity without paying impaired classes in full.  *In re Henderson*, 341 B.R. 783, 789 (M.D. Fla. 2006).

22.     However, the Plan provides that Class 5 equity holders will see equity revest in the Debtors' current owners.  Plan, § 5.05.  This clearly violates the absolute priority rule, particularly

---

[1] It should also be noted, that, to the extent the $350,000 budgeted for administrative expenses in the Disclosure Statement and Plan is for Philip Landau and his firm (Debtors' counsel), Mr. Landau's retention application stated that his fees would be paid by third parties which would not seek reimbursement from the Debtors' estates.

where creditors in certain classes will have to wait months or even years to be paid in full.  Existing ownership cannot retain ownership between plan confirmation and the supposed closing of the resyndication without contributing new value.  *See In re Walden Palms Condo. Assoc., Inc.*, 625 B.R. 543 (Bankr. M.D. Fla. 2020) (equity holders can make a fresh contribution in money or money's worth to insolvent enterprise to retain equity if unsecured creditors will not receive a 100% distribution).  There is no indication in the Plan that the Debtors' equity holders intend to contribute new value, so there is simply no basis upon which to ignore the absolute priority rule in these cases.

23.    Relatedly, the Plan does not include any proposed treatment of the proofs of claim filed by Elevated Operations, LLLP (*see* Claim of Elevated Operations LLLP, Claim No. 3-1 (Jan. 26, 2026)) or Rif-Kosa Construction LLC (*see* Claim of Rif-Kosa Construction LLC, Claim No. 5-1 (Jan. 26, 2026)).  Each is a secured claim which the Plan ignores.  If, as stated, a plan must provide for the full repayment of senior debts before funds flow to junior interests, a plan is not feasible if it does not provide for the payment of all of its secured debts yet intends to permit equity interests to be retained.

24.    The Plan also contemplates that it shall be substantially consummated "upon making the first payments [] to Class 2 Creditors."  Plan, Article XI(11.20).  This seems to contemplate the Plan going effective well before the resyndication process is complete.  However the Bankruptcy Code defines "Substantial Consummation" as:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  As stated, the Plan already fails the feasibility test for various reasons, but Atlanta Housing also submits that the triggers for substantial consummation are objectionable.

The Debtors propose that the Plan shall be deemed substantially consummated even where the primary vehicle for creditor recoveries, the LIHTC Transaction will not be completed.  How can the Plan be substantially consummated where uncertainty remains whether the Debtors will successfully complete the LIHTC Transaction the Plan is centered on?    "Substantial consummation does not occur until all three of these events have occurred." *In re Charterhouse, Inc.*, 84 B.R. 147, 152 (Bankr. D. Minn. 1988).  "As such, all or substantially all of the payments must be made for a plan to be substantially consummated." *In re Dean Hardwoods, Inc.*, 431 B.R. 387, 391 (Bankr. E.D.N.C. 2010).  Relatedly, the Plan also provides that the Debtors will move for a final decree to close the case upon substantial consummation, see Section 11.21 of the Plan,, but closing the case where, again, the LIHTC Transaction will not be closed which would mean the Debtors may operate without this Court's oversight even where the Plan is not fully consummated and creditors have not been paid any material amounts.

25.    Additionally, "[t]he feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *In re Multiut Corp.*, 449 B.R. 323, 347 (Bankr. N.D. Ill. 2011) (citing *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D. Wyo. 1994), aff'd, 56 F.3d 77 (10th Cir. 1995)).  As discussed above, the Plan provides for a speculative transaction that is highly unlikely to occur.  As such, there is no concrete evidence of or detail such as projections regarding future cash flows that could maintain the Debtors' properties and fund its obligations.  Additionally, there is no alternative to the resyndication process in the event it does not move forward or gets materially delayed. A plan cannot be feasible where it does not demonstrate that its primary value maximizing transaction is likely to succeed and does not provide for any alternatives if such transaction fails.  The Plan is also materially deficient with regard to how the

11

Debtors propose to bring their properties into compliance with applicable agreements, the Building Code and other regulations or whether the Ground Lease can be assumed at all without Atlanta Housing's consent given prior defaults.[2] The Debtors will require access to considerable cash to bring the Property into compliance, but the Plan is nonetheless silent as to the sources of interim funding while resyndication is being pursued (and where such funding is clearly necessary given that the proposed resyndication will not be completed until 2027 at the earliest).

26.     Plans must also comply with applicable law. 11 U.S.C. § 1129(a)(3). However, the Plan includes an injunction provision that prevents parties, including holders of Claims, "from taking any actions to interfere with the implementation or consummation of the Plan . . ." Plan, VIII(8.17). If the Plan is approved with this injunction provision, the Debtors could argue that creditors, including Atlanta Housing or other governmental entities, may not take certain future actions to require compliance with applicable federal, state and municipal laws. The Debtors' Plan should not be confirmed with a provision that might prevent governmental enforcing applicable laws to protect the tenants.

27.     The Plan also provides that the injunction applies to "setoff, subrogation or recoupment of any kind against any obligation due from the Debtor(s)." *Id.* But setoff and recoupment are defenses and not claims in the bankruptcy context. *See, e.g., Lee v. Schweiker*,

---

[2] Indeed there is even some authority suggesting that the ground lease in question is nonresidential in nature and thus was required to be assumed within 60 days of the Petition Date. *See Matter of Condominium Admin. Servs., Inc.*, 55 B.R. 792 (Bankr. M.D. Fla. 1985) (lease for land the debtor operated as a mobile home park was "clearly a commercial lease" because the "character of [the business on the land] is not really of any consequence" in determining whether a property lease is residential. The tenants never had a lease with the debtor's landlord); *In re Emory Properties, Ltd.*, 106 B.R. 318 (Bankr. N.D. Ga. 1989) (hotel lease was held to be nonresidential based on commercial purpose and common meaning of the term "residential" even though the hotel itself had permanent residents). Accordingly, because the Debtor did not timely move to assume the ground lease, it must be deemed rejected (*see Matter of J. Woodson Hays, Inc.*, 69 B.R. 303, 304 (Bankr. M.D. Fla. 1987) (Section 365(d) "sets forth facially rigid, inflexible, precise and definitive rules governing assumption of non-residential leases"), and thus further demonstrates that the Plan is not feasible.

12

739 F.2d 870, 875 (3d Cir. 1984).  Courts have written that these defenses cannot be discharged by a debtor in a plan.  *See, e.g., In re SVB Fin. Group*, 662 B.R. 53, 74 (Bankr. S.D.N.Y. 2024).

28.     This is part of a larger problem whereby the releases, indemnifications, and exculpations in the Plan are overbroad.

29.     The Plan contemplates a transfer to NewCos which appears to be a sham sale to a related insider entity and also may not qualify for transfer tax exemptions under Section 1146 of the Bankruptcy Code if applicable here as Section 11.02 of the Plan proposes.  No consideration for the transfer is recited.  Nor is the sale subject to higher and better bids from other parties.

### Conclusion

For the foregoing reasons, Atlanta Housing respectfully requests that the Court deny the Disclosure Statement or require that it be materially revised to address the points raised in this Objection and any other objections filed.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the forgoing was served on all counsel of record or pro se parties via the Court's CM/ECF notification to those parties who are registered CM/ECF participants in this case on June 8, 2026.

Dated:  June 8, 2026

/s/ Jerry M. Markowitz

**MARKOWITZ, RINGEL, TRUSTY & HARTOG, P.A.**
Alan R. Rosenberg (FL Bar No. 92004)
Jerry M. Markowitz (FL Bar No. 182420)
9130 South Dadeland Boulevard, Suite 1800
Miami, Florida 33156-7858
Tel: (305) 670-5000
arosenberg@mrthlaw.com
jmarkowitz@mrthlaw.com

and

13

**DENTONS US LLP**
Jeffrey Zachman (*pro hac vice*)
Alizé D. Mitchell (*pro hac vice*)
303 Peachtree Rd NE #5300
Atlanta, GA 30308
Tel: (404) 527-4000
jeffrey.zachman@dentons.com
alize.mitchell@dentons.com

and

Robert E. Richards (*pro hac vice*)
233 South Wacker Drive, Suite 5900
Chicago, IL 60606
Tel: (312) 876-7396
robert.richards@dentons.com

*Counsel to The Housing Authority of the City of Atlanta, Georgia*

14

US_ACTIVE\137485096\V-7